You'll hear argument next in Appeal 1439 from 2009, Seiko Epson v. Coretronic. Good morning. Welcome to the court. Please proceed. First, let me clarify the correct pronunciation of your name. Utermohlen. Utermohlen. Utermohlen. Pardon me, and thank you. Please proceed. Good morning, Your Honors. May it please the Court, I'd like to first address the 392 patent. The 392 patent inventors confronted problems with illumination at the projector screen and realized those problems could be solved by a new form of alignment. As we've illustrated at page 7 of the blue brief, previously the lamp had been positioned with respect to the conical inner surface of the reflector, but it had not been positioned with respect to the outer surface of the reflector. The 392 inventors used the perpendicular outer surfaces of the reflector and then controlled the positioning of the lamp with respect to those surfaces, and in doing so they converted those outer surfaces into alignment reference surfaces, which had two functions. The alignment reference function was that now the lamp was precisely positioned with respect to both those outer surfaces, and there was also a mounting function, and the patent repeatedly describes that there's both an alignment and a mounting function to the reflector. The trial court held that the prior art contains every element except for the pressing of the reflector against the lamp, and that that was simply a matter of common experience. I know there was some criticism of referring to the Great Pyramids, but still, common sense, KSR referred to common sense. Yes, Your Honor, but the 5000XB didn't have any positioning of the lamp. It had two things wrong with it. First of all, it didn't have any positioning of the lamp with respect to the outer surfaces, and it didn't even use two perpendicular outer surfaces for mounting. So when she used the pyramids and the floor tiles to fill in the gaps of what the evidence was that Kortronik presented, those objects don't have anything like a lamp in them. They don't have to be positioned with respect to a lamp, and they don't have to be precisely maintained in certain positions. There's nothing like an optical axis in those things where they're being aligned with something downstream on an optical axis. So we think she misconceived what the invention was, and therefore misapplied non-analogous art, because it's more than just the mounting of the thing in the reflector. Well, put aside non-analogous art, but how about common sense? Your Honor, there was no recognition in the art that there was a need for better alignment, and there was no teaching in the art that particular… How can you say there was no acknowledgment in the art that alignment was important? Anybody can see that alignment of a projector beam is extremely important. It's blatantly apparent on the face of every diagram and every patent in this art. Your Honor, the question is whether there was a recognition that better alignment was needed. The better the alignment, the better the beam. The whole point of this art is to have as perfect a beam as you can get. Why doesn't that create plenty of motivation to try to improve the aim of the beam and the coherence of the beam? There was also no recognition that you could do it by perpendicular alignment reference surfaces, which was more than just taking, as she conceived of it, more than just taking a rectangular object and placing it in a corner. It was also positioning that lamp without losing the alignment that you already had to maintain with respect to the inner surface of the reflector and position it with respect to the outer surfaces. Why would you be at risk of losing the collimation within the reflector vis-à-vis the lamp and the reflector? I certainly understand the need for proper collimation of the light beam, but I'm hard-pressed to understand what it is that's difficult about setting up a fixed collimated system if you already have two sets of perfectly perpendicular surfaces that need simply to be pressed against one another in order to maintain and obtain collimation. Well, the collimation has to do with the inner surface of the reflector, and the prior art was able to do that. Right. But without losing that, and that's because you placed that lamp at the focus point of the reflector. Without losing that positioning, you also had to precisely manufacture the reflector with respect to the lamp so as to be able to precisely know where the outside surfaces were going to be before you could use them as perpendicular alignment reference surfaces. And there's no recognition in the art that that was an appropriate way to do alignment. The reflector, let's assume, is parabolic. I would assume so. The lamp is at the focus of the parabola, and that produces straight lines coming out of the parabolic surface. All right. Now, in order, as far as I can see, in order to get your alignment, all you have to do then is take a structure as to which the lamp is fixed vis-a-vis the reflector. Then you've got the lamp at the focal point of the parabola, and then to fix the lamp housing in a way that makes sure that the light is going straight out of the lamp, which you can do, it would seem to me, quite simply by making sure that you've got perfectly perpendicular surfaces that are aligned perfectly within tolerances and push them against one another. What is there more to it than that? Well, you have to machine them appropriately, as you say, and control that surface within the very narrow tolerances that are required for alignment in the lamp contact, which in the past had always been done by hand adjustment. And I think to say after the fact that the inventor's invention could be created by doing something that had never been done when there was no recognition in the art that you needed to do that. So is this invention about precision of the alignment of the reference surfaces, additional degree of tolerance, reduction of the degree of tolerance? That's an important, yes, a very important aspect of the invention is to make sure that when you use perpendicular outer reference surfaces, that they're totally perpendicular, and that they line up. Well, they have to match with the housing. But the more important thing is they also have to be precisely positioned with respect to the lamp. And that's what the inventors of the 392 patent recognized would produce better alignment. Mr. Ramone, tell us about the 158 patent. Why did the trial court err in its holding? Well, Your Honor... Why doesn't Nakamura disclose all that was necessary? Nakamura lacks four limitations of the 158 patent claims, which we've included at page 13 of the Blue Brief, the figures 2 and 3 in Nakamura that the court relied on. The first missing limitation is the duct of claim 1. A duct has to connect the air intake port to the air inlet of the power unit in the form of structure that creates an airflow passage. And as you can see in the figures, the air intake port 42, the left margin of that, there's essentially no structure between it and the power supply 15. So we don't believe that under any construction, and certainly not the district court's construction, that could be considered structure that creates an airflow passage between those two objects. The next limitation that's missing in both claims 1 and 5 is an air intake port that directly conducts cooling air from the outside of the outer case to the ventilating path of the power unit. And what that language directly conducts, the patent consistently uses that to refer to getting fresh air from the outside directly... You think the word directly is key? Directly conducts, yes, and particularly directly. Well, the court says at least some fresh air comes in. Well, Your Honor, what this was distinguishing was situations where already used air had been used for cooling things. And this air, while there is some fresh air here, it's mixed with a hot airflow. So I think when you mix something with a hot airflow, that's clearly not what the 150... Is it a hot airflow or is it a little warmer, but still it enables there to be cooling? What was distinguished in the prior art, there was cooling in the prior art, but they used used air. This is also used air. It's a lot warmer because it's already cooled the three different liquid crystal valves on the other side of the projector, which the Nakamura discloses are hot items. So by the time you move that in and mix it together with fresh air, you're not really conducting fresh outside air to the power supply. Why not? Because it's not fresh anymore. It's now been mixed with a major inflow of hot air that's already been used for cooling. But the claim doesn't say all the air going to the power source has to be fresh air from the outside. It just seems to imply that some of it has to be from the outside, and in Nakamura, some of it is. Let's say, for argument's sake, 50% is already preheated because it's cooled other things, and 50% is cold outside fresh air. Well, what the claim requires is that it directly conducts that cooling air from the outside to the power unit. And I think if you read all the times they refer to directly conducts, they're talking about outside fresh air. They don't use the word fresh. They do use the word fresh. Nakamura doesn't use the word fresh. So why does Nakamura teach using cool air from the outside to cool down the power source, even though Nakamura also uses some less cool air and mixes the two streams together before they blast the power source? All projectors ultimately take air from the outside and use it for cooling. But what the 158 patent was directed to was not using that used air for cooling the power supply but using fresh air. And it's directly equated at column 13, as we say on page 37 of our brief, because the cooling air, apparent fresh air, is conducted, the appropriate cooling can be achieved. Well, cooling is achieved, as Judge Lurie pointed out, even in Nakamura. Better than if it were all preheated air because some of it's not preheated. And it looks like a further optimization of that principle to say, all right, well, now let's have only fresh air blasting the hot power source to cool it down maximally. Why isn't that perfectly obvious? If fresh air is good, more fresh air is even better for cooling because fresh air is cooler. Complete fresh air would be the best way to cool the power supply. But there's a lot of other elements that you have inside that create constraints on how many air flows you can use, where you place things, how many exhaust vents you've got, what fans you've got, what noise that creates. So that's why there was difficulty in providing all the advantages that are claimed in the claims of the patent. The limitation that we're looking at here and focusing on, I think, is the one that says a second cooling air intake port located on the outer case that directly conducts cooling air from the outside of the outer case to the ventilating path. Now, the ventilating path is at the beginning of the power unit, as I understand it. It's through the power unit, but it starts at the power unit. Okay, so anything that occurs before the power unit is not part of the ventilating path as used in the claim. That's correct. All right. Now, your contention is that directly conducts cooling air really means directly conducts fresh air, parenthesis in effect, which is not converted into anything but fresh air until it hits the front of the ventilating path, correct? Well, certainly that it's substantially still fresh air when it gets there and not mixed with a major flow that's already heated. And even though there is air which was taken from outside and is fresh air, the fact that that air is mixed, you say, before it hits the ventilating, the beginning of the ventilating path, means that it is no longer fresh air. Especially mixed in a substantial way as shown in Nakamura, yes. But even though it may be cooling in the sense that it is able to affect the cooling function. Yes, the prior art had cooling function. The 158 patent said it didn't have a sufficient cooling function. We don't think it's inherent in Nakamura that that air that's shown post-mixing inherently had better cooling function than just using regular air that's already circulating in the projector. But I guess you would agree, though, that this Nakamura, at least if you accept the Appleese construction of Nakamura and saying that it's schematic and it lacks some of the structural features that are necessary to make the air flow in a particular direction. But set that aside for a minute. Your position would be that Nakamura is at least halfway between a pure system that uses preheated air and a pure system, that you say the claim reads on, which uses only fresh air pointed directly at that ventilating path. Nakamura is kind of halfway between, right? Because it uses a little of both. Well, I think Nakamura compared to the prior art is way over on the prior art side. How do we know? We don't know how much air is coming in through vent number two. I'm sorry. Go ahead. I think it really has to be turned around the other way. What Nakamura is being used for here is an inherent reference that anticipates the claims of the 158 patent. And you can't tell from Nakamura that that air is substantially cooler than already heated air. Because you can't determine from it how big the air flows are and how hot they are versus what the outside air is going to be like. So I think it's really incumbent on the prior art that's being used as anticipatory to necessarily have the feature. We don't believe it does. We've asked you a lot of questions, and so we're going to restore all of the six minutes of rebuttal that we sought to reserve. We'll hear from Mr. Heminger. All right. Thank you, Your Honor. Good morning. Please proceed. Thank you, Your Honor. If it pleases the Court, with regard to the 392 patent, I think one of the critical decision makers is what the Court had below. These arguments about the alignment surfaces and the optical alignment, that was not an argument at all made by their expert, Dr. Keller. In fact, if you look at 2439, which is his declaration in opposition to the motion for summary judgment, the only element that he disputed was not found in the 5000XB was the spring pushing aside. Hence, the district court saying the only element, it's undisputed, that all the elements there are except for the spring. And in fact, the 5000XB does have a spring in it. The only point was it pushed it down and to the front. And the Court, applying the teachings in KSR, also following the cases for ball aerosol and so forth, put specific reasons as to refining as to why that would be common knowledge to use the spring to push over to the side if you wanted to improve alignment. Moving to the 158 patent, the issue here is more directed to the duct, the last element of the claim. During claim construction, they argued for a broad definition of duct. In fact, Quartronics said you need to have a complete duct like duct 170 shown in the figures for the directly cooling air to get in. Instead, they argued, no, we don't need that. The reason they argued that is because the Quartronics projectors did not have it. They got the broad interpretation of structure to direct the airflow into the ventilating path going through the power supply. If you only have some structure that directs, you are obviously going to have to have some mixing of the air. And in fact, the Court's interpretation of directly cooling air is essentially the interpretation that Seiko Epson argued below. She found theirs preferable but said substantial contamination is ambiguous. I would like to have something dealing with temperature. I'm not sure I am. Well, why don't you finish your point and then I can read it. My other point is she adopted in substance their argument. Merely putting in some limitation as to what substantial means and that we're dealing with temperature. Well, I'm not sure I understand the point you're making there because if you took, and this is at page 62 of your brief, there's a comparison between Fig. 6 of the 158 and Fig. 2 of the Nakamura. If you took the Nakamura and you changed the path of the vent 36 and instead of going down and joining the path of the vent that comes out of 4142, but instead directed the top vent directly out the exhaust fan. Are you following me? I'm following you. If you did that, then you would have all the air coming in at 4142 being drawn presumably by structure because otherwise how is it turning around corners through the power unit without ever having been contaminated by any other considerable amount of air in the system and then going out the exhaust. You would have the claimed invention at that point as I think the other side would agree. So that Nakamura is different from what it could have been to more closely embody the invention as they see it. Correct? That is true that Nakamura does not only bring the fresh air directly into the ventilating pathway. We don't dispute that. Right, but I thought you had just said that there's no way you wouldn't end up with contamination in a structure such as Nakamura and I just thought I just described a way you could do it without contamination. I understand now your point and my point would be if that were the case, if you redirected the airflow from 36, the wall in between the, if you will, the current duct 41, there's a wall along there making two chambers. That would then form a duct, if you will, that directed the air into there much like you had in the figure six of the 158. So yes, you certainly could reconfigure it, but if you isolate the airflow from the duct so it doesn't mix with anything else, if you have a totally enclosed duct, then you have the same thing as the preferred embodiment in which in the column three of the 158, they actually distinguish that. They talk about, and if you want to, you can have only fresh air in there by having the duct 170, which is the preferred embodiment. Well, why isn't the description at the top of column 15 a description that explains to us what the limitation of the claim that we've been talking about entails? And I'm particularly focusing on this statement that the power unit is cooled with great efficiency, and this is just a general statement as I read it, because a cooling air conducting means is providing for, now the critical language, directly introducing fresh air, not just cooling air, but fresh air, into a ventilating path provided inside the power unit, which says to me at least, and maybe I'm misreading this, but it says to me that when you get to the beginning of the power unit, which is where the ventilating path begins, what you have is fresh air. You don't have mixed air. You don't have what used to be fresh air and now is a mixture of the preheated air plus what used to be fresh air. And in the preferred embodiment, they have that. So you say that that paragraph at the top of 15 is only a description of the preferred embodiment? Yes, that is correct. They talk about, and I know they say, although there are other embodiments, we don't restrict it, but whenever they talk about only directing the air in, they're talking about the preferred embodiment of duct 170, and you find that if you look at column 3, at lines 4 through 7, it talks in general, because the cooling air conducting means directly conducts fresh air into the ventilating path, and because fresh air is cooler than the air in the outer case, the interior can be cooled with high efficiency. It then goes further on down at line 17. I'm sorry, what column are you on? I apologize, I was too quick. Column 3. Go ahead. Then further at column 3, line 17, they explain, accordingly the duct section only introduces fresh air from the cooling air intake prior to the venting path. So here they're expressly stating if you only want fresh air, you put the duct in, so it gives a broad reading. But in any event, even the claim construction that SACOEPSIN is urging for, it says substantial heat contamination. Well, okay, that means they recognize that it can be heated, and it can be mixed, and in fact there is even a little gap, if you look closely, at figure 6 between the channel 70 and the duct 170. Is that bigger or less? Granted, patent drawings are to scale, is it bigger or less than the gap in Nakamura? And the point is the invention they had was essentially, if anything, was instead of having a situation where, for example, you only have the one duct 36 like in Nakamura, they said put in another one, put in an additional vent, and send that air directly into the power supply. That, if anything, was their invention, and actually claim 5 doesn't have a requirement of a duct. Mr. Heminger, tell us why the 899 patent was invalidated over Miyashita and Kobayashi. Why it was invalidated? The court below said it would be obvious to find the teachings of Kobayashi with Miyashita, and Miyashita is actually a device with a case within a case. It said I can solve the heat problems by, if you will, putting a duct completely around an inner casing, and blows air through it with heat conducting members from the interior casing to the outside. Effectively, as Seiko Epstein argues, providing the cooling of the entirety of the interior, including the lamp. Kobayashi is only directed to a replaceable lamp module. The argument from the obviousness finding was by the court that it would be obvious to modify Miyashita to include the replaceable module of Kobayashi. The fact of the matter is there is a dispute in the experts. This is the typical dispute in the experts, much like in the Commonwealth Scientific versus Buffalo case. We have the expert of core products finding that if you do that, you do not end up with the claimed invention, because you then have the Kobayashi module sitting on the interior casing. I misstated the question, but you're answering the real question. There are so many patents here going different ways. The court held that it wasn't valid, right? The 899 patent was invalid due to obviousness. And you take issue with that on your cross-appeal? A little bit, yes. And I think you can see the battle of the experts if you look at the declarations at joint appendix 1343 to 44. That's the Keller opening declaration. At the Biber opposition declaration 2515 through 17, in their reply, which they included, 2689, Seko argues about the combination. And then in the Keller reply at 2811, you see there's a huge dispute, a factual dispute. If you combine these two pieces, do you have the invention? Of course, there's issues with motivation and so on and so forth. But the main factual issue, and it was not addressed, if you take a look at the court's opinion at page 23 of the appendix, you will see she addresses motivation and other issues. She does not, the district court, fail to address this resolution of the fact, if we do combine these, how do we get these two together? Do you want to reserve the rest of your time? We'll follow on the cross-appeal. I was just going to make one mention with the 8331 patent. That is a claim. You mean you were going to argue that there was no first fan when Claim 5 depended upon Claim 1? The site's a first fan? Well, Claim 5 introduces for the first time a first fan. There was a rejection on Claim 5 because the first fan, as it originally appeared, had no antecedent basis. To correct that indefiniteness, that deficiency, rather than adding a claim to Claim 1, they changed it and said, you're right, I don't have a dependency in Claim 1, so they made it the first time introducing it. So it would be impermissible to now read a first fan into Claim 1. And I will reserve the rest of my time. All right. Thank you. Mr. Ruderman? Thank you, Your Honor. First, I want to address the point on the 392 patent. This case, in that respect, comes to you in an unusual posture. Counsel made the point that obviousness wasn't addressed in detail in the declaration of Sekou Epson's expert. The reason was it's because Kortronik's theory of the case was basically that the 5,000xB lamp unit was anticipatory. And what happened was they had some conclusory statements, and if it isn't anticipatory, it would be an obvious. We took the deposition of their expert, and we said, all right, how would you modify the 5,000xB lamp unit? He said, I wouldn't. I don't think one of ordinary skill in the art would have modified that lamp unit. So I think at that point there wasn't any evidence in the record that really went to obviousness. And we think on their expert alone, there's an issue of fact as to whether the 392 patent was obvious. The court then, in her opinion, went off on her own theories as to how obviousness might be achieved. But I think we didn't get an opportunity to address that. How about the 899 patent? The 899 patent, it's presented as a dispute of experts. It's not, Your Honor. Our expert, Mr. Keller, testified to two ways in which Miyashita and Kobayashi can be combined. The main way he said they could be combined is by taking the two ducts and making them one duct. That would bring the guiding surface right into the duct of Miyashita. Their expert never addressed that. I don't know why, but she never addressed that point. She went off on the other way he said you could do it, which was to set it down on top of the inner casing, in which case you'd have a double-layered duct at that particular point. All of her comments went to that. She never addressed his main way of combining the two references did satisfy the claims and therefore properly supports the opinion of the district court. Then on 831's second exhaust fan issue, I think when you use a term like second exhaust fan, the ordinary meaning of second is that it implies another like fan in the system. Particularly when the spec refers to a first fan. Yes, the spec had first fan, second fan, third fan, dependent claim six, which is dependent only off of claim one, as a third fan. If there was any doubt on the point, the examiner in prosecution flagged it for Quartronics, saying it's my understanding and assumption that there actually is a first fan in the system in claim one, and yet they didn't amend that. There was a clear way to do that. The way to do that was to just recite a fan in claim one, and then they wouldn't have had these issues. I do have one question. Could you move back, bouncing around from patent to patent, but could you move to 158 for a moment and address the question of whether the material that I was focusing on in questioning your opposing counsel at the top of 15 is, in your view, a description of a preferred embodiment or a description of the invention as a whole, and if the latter, why? I think it's a description of the invention as a whole, as is 13. I think there's a duct in claim one. When you have a duct, then the language the counsel pointed to in I think column three about only getting cooling air there is correct, but the invention is clearly broader than that. Claim five has no duct. They both use the directly conducting language, and throughout the patent, directly conducting is used to refer to getting fresh air into the power supply, whether you do it by a duct, whether you do it by positioning. One thing I want to make clear— Presumably, if you have no duct, there will be some contamination of the fresh air. That's why we have substantially contamination, free heat contamination as our construction. Even if you have a duct, you put a duct in a heated body, there's going to be some conduction of that heat to the duct, and a little bit of it will get into that air as it goes through the duct. We're not saying it has to be absolute 100 percent, but clearly the focus of it is on getting fresh air into the power supply. In Nakamura, by the way, those air flows are not structure that produces those air flows. Nakamura discloses that the exhaust fan is pulling the air in that direction. Just because the air comes into an intake port and moves left doesn't mean there's any structure causing it to happen. Well, but I think it isn't structure implied. Otherwise, why do we have all these right turns? I think, Your Honor, that's because it's just a schematic diagram. They've got a right turn there with no structure to produce it. Well, they have a right turn, but that would suggest not that there's no structure that produces it, but that there is structure that just isn't included in the diagram. I think what it implies, actually, Your Honor, is that this is just a general drift of where the air goes, and, in fact, it would not make a right turn. Okay. All right. Thank you. Thank you, Your Honor. Mr. Heminger, you're just under two minutes. Thank you, Your Honor. Very quickly, Judge Bryson, in response to your question regarding Column 15 in the first paragraph. What pattern is that? I apologize. There are too many patterns. Patent 158? I don't think you have the opportunity to have the last argument. Only on fossil fuel. All right. Thank you. The last point that I'll make with regard to the 831 patent is, in fact, that the comment that it would be just a simple thing to add a first fan into the Claim 1, that would violate all principles of claim construction because then we have a cooling apparatus, and it says, plus some first fan somewhere without connected, without any indication as how it connects to anything else. So I don't think this Court wants to come down and say that if someone happens to choose the reference in the specification as a second fan instead of fan B, for example, that it means that you've got to have a first fan no matter what you do, whenever you use that term. I just do not think that that is a proper application and a policy as to where people want to go. And with that, I thank you, Your Honor. Thank you, counsel. The appeal is submitted.